Good morning. Good morning, Your Honors. May it please the Court, Mark Elliott, appearing on behalf of Whittaker Corporation. As you alluded to, Your Honor, I would like to aspirationally assign maybe 13 minutes to my opening appeal on behalf of my client, reserve seven minutes to respond to the points on that, as well as to address the cross-appeal. So, Whittaker raises three issues on appeal, and all three of these issues are directly associated with the issue of restoration costs. The theory of damage is asserted by Santa Clarita Valley Water Association in its litigation and is awarded by the jury. Restoration costs, which are recognized in their California law, as a form of damages, tort damages, for damage to real property. The three issues all spring from that. The first is whether the district court erred in permitting the legal theory of restoration costs as a measure of damage to property to be asserted after the close of evidence, because while the dollar value of restoration costs, the cost of cleanup of the groundwater, was presented in the Rule 26 disclosures, and in discovery, the category damage, the theory of restoration costs, was never disclosed in initial disclosure. So what additional evidence was not admitted as a result of what you assert to be a shift in the theory, or the identification of a theory that you didn't realize they were pursuing? So, Your Honor, the theory of restoration costs under California law, the primary theory of damage to property is diminution in value. There are alternative theories of damages that may be awarded in the tort case, such as loss of use, loss of profits, and restoration costs. However, because the primary issue is the primary form of damage that is available is a diminution in value, courts have established that restoration costs actually are a little dangerous. They have the potential to result in a windfall. So the law in California is there are additional factors on which evidence must be presented and, as a matter of fact, needs to evaluate before restoration costs can be deemed the theory of damages. Does your view that include the value of the property in what I'll call pristine condition before any manufacturing activities occurred and any contamination was introduced to the soil and the groundwater? I actually know, Your Honor, it's the value of the property prior to the damage associated in this instance. It's alleged to have arisen from my client. Isn't that what I just said? Well, you said pristine prior to manufacturing activities. Well, yeah, because I'm looking at it from a practical proof problem, and that is Whitaker was not the first manufacturer on the property, correct? So that to restore it to the condition that it was in, I guess, under your theory, it would be to restore it to the condition that it was in on the date that Whitaker acquired title to the property. Is that it? Actually, Justice Sullivan, that's not the facts we're dealing with. I'd love to do a test of this, but it's just fine. Judge Sullivan, that's not actually the facts of the case. The facts of the case are dealing with the Bermite manufacturing facility, the Bermite facility in the Santa Clarita Valley. That property is roughly 900 acres. It was a defense manufacturing site. In fact, the Department of Defense has been used over the years, has it not, for fireworks and ammunition manufacturing, and that's where all these not just chemicals. Correct, Your Honor, but the property damage claim that's asserted by Santa Clarita is not in relation to the devaluation or diminution in value of the Whitaker property. Rather, the property damage claim that's asserted in this case is the fact that their position is that contamination in groundwater has escaped from the Whitaker property, migrated some distance, actually miles, in relation to well V-205 away from the property, and the property that's been damaged is not the industrial facility itself, but rather the groundwater that the agency asserts it has the right to pump and then distribute. So going to your question about what needs to be shown regarding the condition of the property, California law states that for a restoration of cost claim, you must show that the property will be restored to its original condition prior to the impact of the defendant. So in this case, if there had been, I'm back to my practical proof problem, if there had been contamination of the water from other manufacturers who owned the property before Whitaker acquired it, wouldn't it require some sort of a study to have been conducted at the time Whitaker acquired the property in order to establish a baseline? We don't know how much contamination there was in the surrounding property on the date that Whitaker acquired the property and began manufacturing. Again, Your Honor, we're not actually looking at the Whitaker property and the sources. I understand what you're saying, but I don't know if we're talking past one another, but I'm trying to figure out where we begin in order to measure restoration costs. Well, you're talking past me in the sense that everyone knew what this case was about, okay? I'm all trial lawyer, trial judge, the whole thing. And when you claim something, you seem to be claiming surprise over something that I don't think you're arguing. They couldn't argue it that way. You have to know every theory they had of the case, but it seems like everyone knew everything that was going on here. And so I just don't see how you were surprised. I don't see it, other than if you got a bad verdict against you, that would be a bad surprise. But I don't see anything that helps you saying in California law that says you can't, that they have to tell you every theory or everything that they're going to argue. Well, Judge Callahan, I don't necessarily disagree that they have to tell us everything. The problem here is that the original theory of damages in this case that was proffered by Santa Clarita, they argued that they had to have VOC, volatile organic compounds, for chloroethylene, PCE, trichloroethylene, TCE cleanup. They needed to have essentially a treatment system in the form of granular activated carbon to clean TCE and PCE out of the groundwater so that they could legally strip it. And didn't they introduce all of that evidence during discovery in terms of what it cost to treat the water? Yes. Yes, they did. So I'm back to my original question of once they did that, then why didn't the burden shift to Whitaker to prove that those costs were inflated or disproportionate to the harm that Whitaker had caused? Because, Judge Tolman, it is their burden of proof under California law. Absolutely, when you seek restoration costs, you have additional conditions that you must show. First, you must show that the restoration is to original condition sans the alleged TCE and PCE. What case are you talking about? Is there a case under California law that clearly states that in order to recover restoration damages, a party must print the original condition of the property? I didn't find that case. Your Honor, that's going to be Salazar, and that restoration or damages cannot improve a property and cannot make it better than it was before it was damaged by the defendant. Instead, restoration costs must return the damaged property to its condition prior to injury. That's the recovery, and what Judge Tolman is saying is that it's your burden to say that they're trying to get damages that they're not entitled to. But what you're doing is I want to say that you're elevating it to an element of what they must prove. I could not find a California case that says the party must prove the original condition of the property. And when you're saying that was their burden, they didn't do it, I think that's an element of it. Why wouldn't you then have to show that the treatment costs that they actually incurred were unreasonably high? Your Honor, that's an excellent point, which you need to understand that's not an excellent answer. I think I do, and I think it goes to the prejudice arising from the Rule 26 issue. Scientists originally claimed that it had to clean up because the division of drinking water, the subdivision of the State of California under the State Board that oversaw groundwater, was going to effectively order them to use a GAC, granular activated carbon system, to do cleanup. Trial court concluded, in fact, there was no such order. There was no showing by plaintiff that they had to use GAC to clean it up. As a matter of fact, Your Honor, there are four wells in issue, Saugus I and Saugus II, currently, which they contend, has GTMPC attributable to my client. That GTMPC, in 20 years of testing, has never exceeded the maximum limit given to counsel. I'm looking, and maybe I'm looking at the wrong document here, but I'm looking at PR339, Plaintiff's Fourth Amended Initial Disclosures, and I see a long list of stuff there, a long list of numbers. Is your claim that when you were conducting discovery, and then when you got to trial, you were totally surprised by the evidence the agency put on, because somehow it was completely different from the damage computations they had disclosed, for example, in the Fourth Amended Initial Disclosures? Your Honor, we were not surprised by the dollars. The problem is because the court ruled initially that the claim for damages was speculative, and threw out the damages claim because there was no evidence to support that the Division of Drinking Water would, in fact, require VOC cleanup, because wells S1 and S2, for example, that are operating and providing water to the system for which they want to have these cleanup systems now be applied are currently providing water to the customers without cleanup, just with blending. Well, since you claim, which I don't necessarily agree with, that the party must prove the original condition of the property, if you thought that without case law to support, couldn't you have brought some motion in limine before and say it's our position that they have to prove this and know one way or the other, and if they said, well, no, they don't, then? Your Honor, the point that it was necessary for them to prove the original condition of the property was raised before the trial court. The trial court concluded that because we knew the dollar value, that it was essentially material. But the point that we're struggling with at the case right now is because this arose after the close of discovery, after the designation of experts, after the deposition of experts, essentially at the final hearing before trial, there was no ability for Whitaker, there was no ability for Santa Clarita to designate and present an expert on diminishing of value, which under California law is the primary measure of damage. The term diminishing of value, but measured against what? I'm still struggling to figure out where we begin to damage this analysis. Your Honor, it has to be, it seems to me, under your theory, at the point where Whitaker acquires the property, and whatever the condition of the groundwater was at that time, which may have been contaminated by earlier owners or other businesses in the vicinity that contaminated the water, you're saying Whitaker's not responsible for that. So in essence, your argument is that they over-treated the water, and therefore used excessive funds. Well, Judge Tolman, they haven't. Again, this is not the Whitaker property. This is miles away. Well, I keep saying Whitaker property by using it as a hack, you know, basically. But, Your Honor, the condition I have now, and they did it in my time, so I apologize. It's a complicated case. Yeah, no, I understand. This is in part why the Star 1 and Star 2 cases are discussed. And I want to analogize to Star 1, because it really actually becomes applicable here. So in Star 1, a plaintiff, the plaintiff's counsel who I'm friendly with in the Central Valley, argued that groundwater, which was not useful for agriculture because it was contaminated with high levels of total dissolved solid sulfate sulfate, it couldn't be used for agricultural purposes. They were displeased in that era in injecting oil field wastewater, that that water was migrating into the groundwater beneath their property and was a trespass. And they argued that they should be entitled to restoration costs, the cleanup of that groundwater. The appellate court in California threw out the award for restoration costs, finding, in fact, plaintiffs had not shown one of the elements of restoration costs, that the water would be returned to its original condition or potentially would be returned to a better condition. In that case, the evidence was introduced by a plaintiff's expert that upon cleanup, the water would then be usable for certain agricultural purposes, so it would be better than before. Well, he got that when he talked about it. And that's... He did that here. Well, actually, let me address that, Your Honor, because the testimony that was provided here, Trent's poem is pointing out that maybe there are other sources of T.T. and P.T. out there. We don't dispute that. We're trying to figure out how you were prejudiced, because there was evidence out there that you otherwise would have unearthed, no pun intended, in order to show that the treatment costs were excessive. But, Your Honor, the treatment costs, there was really no evidence introduced that they would return the water to its original condition, but we don't know what its original condition was. Actually, we do, Your Honor. It's in the record. Okay. The record does include testimony from the employees, not from Mr. John, not from the expert, but from the employees of Santa Clarita. In fact, the water contained total dissolved cellulite and sulfates, same as we basically saw in the Stark case, and were not alleged to be attributable to Whitaker. I can provide the citations to the record. Well, I guess the question I'm asking you is, the water district proved the amount of money that it spent treating the water. It was spent. And would spend in the future. Well, it hasn't been instituted, Your Honor. This is all in the future. All in the future. Okay. And you argued that was too much, right, to the jury? No. What we argued is what's not been evaluated is it's not evidence of speculation. Is that what you're saying? Well, no, we're saying they didn't prove an element of the crime, and, therefore, it's out. It should be entitled under guilt. It's not an element. It's not an element of the crime. It's not. It's basically an element of the claim. Your Honor, I apologize for speaking over you. Oh, no. But what I want to make sure the Court is aware of is that in the record, in my provided citations, we have total dissolved solids and sulfates. In fact, well B-201, which is currently being pumped, water has to be purchased and blended for discharge, okay, because of total dissolved solids and sulfates, not because of the alleged PC and GT that is purportedly attributable to Edgar because those levels are so low and have been below. The jury heard that? Yeah. And they didn't buy it? They didn't buy your slide of it? No, no. They heard that the TDS was there. And there was no evidence to introduce that. After cleanup, the TDS would still be there or not be there. There was also. Didn't the jury hear evidence that the costs for future cleanup that is attributable to your client and your property? The jury held current evidence that the TC and PC was in part attributable to releases from my client's property. That is right. And you made the argument that the damages they are seeking are not to remedy what we allegedly did. The arguments were made that the – this goes to the second point of how to be able to pursue restoration costs in California. You also have to show that the award of damages or the restoration cost is not unreasonable in relation to the cost of the diminution in value or the damage that was caused by the party. And we do argue in our appeal that an award of somewhere south of $60,000, we don't know the exact cost to install a treatment system. $60,000 or $60 million? $60 million. Thank you. We don't have exactly in the record what would relate to exactly the treatment systems for the PC and TC. But the record is not in dispute. It is undisputed that the water in the four wells at issue have never met or exceeded maximum contaminant level. It is the case that the water may be drunk. It is also the case that well S1 and S2 doesn't have a treatment system on it right now. The water is blended with state project water to bring down the TES and the MCLs. And potentially, I guess we're not here on her, the wells S1 and S2 also have PFAS in them. Everything is at low levels. The agency has always represented the water in the drink. It's always been drunk. May I make a suggestion, since you've used all of your time? Yes, I have. That idea for 10 minutes. After we sit down now, let's frame the issue, and then we'll go back again, go from there, because I think maybe it will help the Court to frame it here and then focus it more. So you have 10 minutes coming back. Thank you. Good morning. Good morning, Your Honors. Good morning, Your Honors, and may it please the Court, Jennifer Meeker on behalf of Santa Clarita Valley Water Agency. I was following your interaction with Potent Counsel very carefully and would like to try to jump straight into the concerns here. I'm not picking up a particular concern with the Rule 26 sanction, Rule 37 issue. Okay. And so I would like to jump straight into the allegation or the contention that in order to obtain treatment costs and in order to affirm the jury verdict on the treatment costs awarded, that an original condition of the property must have been shown, and otherwise that this jury verdict is subject to reversal. And as Justice Tullohan, you, I think, outweighed plans to be a justice. But then I came to the federal court, and they brought me down to justice. I apologize. I was never one. There is no justice on the Ninth Circuit. No, there is not. I don't think that's true, that there is no justice in that. There is no justice this year. Okay. Okay, my apology, Judge Tullohan. I think you awfully pointed out that there's not a single case in California, and this is applying California law. There's not a single case in California that has imposed a burden on a plaintiff, particularly in a groundwater contamination case, to show original condition of the property here, the groundwater, prior to contamination, admitted contamination or found contamination by a polluter. There isn't any authority for that, for the reason that tort damages in the State of California is measured by, and this is a quote, the amount which will compensate for all the detriment approximately caused thereby, meaning the bad act. And that's citing Civil Code Section 3333, which we cited in our brief. And I think the case law that really has come up in my research has shown that this rule is a flexible rule. It's not a fixed or invariable application. This would be great to find Mr. Elliot Barrington. What he's saying is his client was responsible for a certain amount of the contamination involving a certain type of contaminant, but the water has other contaminants in it that his client was not responsible for. And, therefore, your treatment of the water and the costs that you seek recovery for treated more than just the damage caused by Whittaker. The question I keep wrestling with is how you would prove the difference. And I think even this concept of a baseline, to figure out what the quality of the water was at the time before Whittaker contributed additional pollution to it. Sure. And I don't, I mean, this property, I think, has been in use for, what, decades, right? Absolutely. Whittaker, the Burmite site, Whittaker's property that they took over, it started polluting back in the 40s by dumping degreasers and the like indiscriminately into the ground, hiding it from the EPA, which allowed, obviously, all of this contamination to, you know, migrate off property into the water supply that served for drinking purposes. So what I'm trying to say is, if you're saying that you don't have to prove the original condition in order to recover restoration damages that they're shot, are you then, but do you think you're entitled to everything from the pristine? Or are you saying that then it's their job to come back and say, well, we're not responsible for all of that. We came on the property at such and such time and blah, blah, blah. I think it's kind of a double whammy, Your Honor, and the reason being is a couple of things. First of all, on this record, the facts are that Whittaker contributed, and again, it's based on Charlie's edit 34, which is 1448 in the record. Whittaker contributed to VOCs, which are the PCE, the PCE. Whittaker contributed to those VOCs. It's in our water. It's come up in our wells. That's undisputed. They have also pointed, and I think at that point, you know, our burden under California law, based on joint civil liability, unfortunate contribution, and the like, is to just show that Whittaker was a substantial factor in causing, say, on the VOCs. And you did get a small contribution from the bankrupt prior property owner. Yes, I did. And that's correct. And that was pro tanto or whatever that was. That's correct. There was a good faith settlement determination, which Whittaker opposed. It was their burden to prove that a settlement was inappropriate. They didn't meet that burden, and they had to appeal that ruling. And the judge ruled pro tanto rather than pro rata. That's correct. And whatever correctness or incorrectness there was in not doing pro rata has not been appealed. That is correct, Your Honor. So when it comes down to the VOCs, focusing on the VOCs, Whittaker caused at least a large portion of those VOCs, the jury heard the evidence and determined they were a substantial factor. From that point, you know, whatever anybody else contributed is up to Whittaker to prove that they weren't the contribution. And even if they had proved that somebody else had contributed under joint and several liability in the state of California, they would still be responsible for 100% of the jury verdict. But I assume that they argued to the jury that the amount of money that you were seeking was unreasonably high. That's correct. And they did so primarily based on the, I don't want to call it a fallacy because that sounds really rude, and I apologize for even saying that out loud, but the idea that Danica Rita has not been harmed or it's kind of a no big deal that there are VOCs, which are carcinogenic, cancer-causing, not natural contaminants. The idea that these carcinogenics are really no big deal in the water because so far the wells admittedly haven't pulled up water, that have exceeded the MCL, which is, you know, the EPA's level. We find that it's still, quote, unquote, drinkable. According to Whittaker, it's still drinkable. I wouldn't drink it, but according to Whittaker. What are you doing about that? I don't live in Santa Clarita. But the key point there is that the harm, reasonable amounts of harm, there's no fine line based on an MCL level. And, in fact, Santa Clarita's harm is more, and what is ignored in large part unfairly, is that in order for Santa Clarita to serve water for drinking purposes from this particular aquifer, it's from a substantially impaired source. And, therefore, DDW has imposed on Santa Clarita that to get a permit for drinking water for drinking purposes, the VOCs, all contaminants, but the VOCs as well from Whittaker site must be down to a non-detect level. And for this August 1 and this August 2 wells to date, I'm so sorry, my part, for those to – yeah, do you mind if I – No, we don't know where it's from. Excuse me. For this August 1 and this August 2 wells, what has happened is there is no treatment for VOCs on that facility. And so what happens is any time they pull up water that is exceeding the non-detect level, which means zero, they have to blend that. So they have to purchase water, clean water, and they have to blend it out. And only then can they serve it. So the idea that they are serving water willy-nilly from this August 1 is not true. And so what Whittaker is actually asking is by saying that the MCL level is this, you know, this threshold, I guess, so to speak, is that they're saying is no big deal, no harm if Whittaker or if Santa Clarita is just violating permits, can't get permits to serve drinking water. And all of this was presented to the jury, and the jury rejected that. The jury said, no, I think that there is damage here, and that treatment to – and the evidence from Dr. Najram, who did a PhD in DACA treatment, the evidence is that this treatment will remove VOCs. There isn't any other evidence that it's going to remove anything else. And what the evidence is is that there was water that was able to be used for drinking purposes. There was contamination found from Whittaker's site. The water could not be drunk the way it is because of non-detect and other reasons. And then there's a treatment that will remove the contamination to restore the water to its pre-drinking use and purpose. And so I think under all these circumstances, the jury's award absolutely should be affirmed as being, one, reasonable, and, two, being appropriate damages under California law to, quote, compensate the plaintiff for all of the detriment approximately caused thereby. And with that, if you don't mind, I'm going to move over to our – Laura, I would like to talk about your surplus cost appeal. Is that where you were going? I was going to go to RCRA. Okay. I'm more interested in surplus here. I'm more interested in surplus also. And I have a specific question. Okay. I will jump to surplus. If you don't mind, I'd like to have a couple of minutes on RCRA, if that would be okay. I'll do that over to you guys. But we're going to talk about surplus. Yes, surplus. We are on surplus. Well, it all has questions for this. That's because you claim that, I think what the district court did, said you couldn't get a surplus declaration because that would be double recovery. Right. And you also said in your cost appeal, I'm just sort of giving you my thought process here, that it was somewhat a prophylactic cost appeal in the sense that if the cost was $68 million that you wanted to have that declaration. And the declaration is not really a double recovery. So you're asking for two things, saying the court erred on that it was saying that it was a double recovery because the declaration is different than saying that, you know, allowing you more damages than 68. So if it was error that you can get a declaration, just hypothetically, that you can get a declaration, what would happen next? Because if you got a declaration, basically you're saying if you get the 68 million, you're not going to do anything with a declaration. Does the company have to go back to the district court? Or based on this record, can we determine? I know the district court made determinations saying that there was no public for one set of loans. For one, yeah, for one. Not for the blended, I guess, but for the other. But I'm wondering if it would be any different for the blended. So let's say we agree with you and say, okay, you're entitled to a declaration. Is there a way to avoid going back to the district court? So I think this is how it played out. And I admittedly am more of a pallet lawyer than I am a circle of lawyers, so I apologize. But more I apologize than I am. So that's fair. That's fair. My understanding from studying the cases and studying and talking to my colleagues and the like is what the declaratory relief would do would only, you know, I hate to say it, but it's kind of one of those, it's a judgment in my pocket, right? And it would only apply to liability. So it wouldn't apply to recoverability. And what that would essentially do is, to the extent that there are costs that are not covered by this verdict, this jury verdict, and those aren't hypothetical. For example, you know, we calculated the cost of future blend and future replacement costs up to a certain date. I know at least one of those circumstances I think has come and gone. So to the extent my client is still incurring replacement costs or blend costs while these treatment facilities are being built, what we would want to have the ability to do is to go back into court with the DEC relief where we would have to show liability, again, for these surplus costs. Because we've already shown all the general requirements, including, you know, public participation and the like. But didn't the jury include 30 years' worth of future costs, damages of war? That was for maintenance of the treatment facilities. It wasn't for purchase, for example, of replacement costs or blend water costs that were incurred while the facilities are being constructed. So, Chancellor, let me ask some specific questions on this issue. So even if, hypothetically, we were to uphold the jury award, you would still want declaratory relief with regard to future IPD costs? I don't think that there would be IPD costs. Okay, so you would not want declaratory. So if we were to uphold the jury verdict, would you not need declaratory relief on IPD, on the IPD issue? I disagree. I'm asking. Yeah, and I have the answer, no. Or the answer is, yes, I would want. You would still want declaratory relief on the IPD cost. Because we don't have to prove that future IPD costs are likely to happen. Okay. And then on replacement water costs, the record would allow us to determine the public participation in the National Contingency Plan issue, wouldn't it? I'm sorry, can you repeat your question? Yes. So with regard to declaratory relief on replacement water costs, the record would allow us, and it's going to position us, the district court, to determine whether you complied with the public participation part of the National Contingency Plan, correct? That's my contention. But with regard to blend water costs, as I understand it, everybody agrees that if we got to that point, the district court didn't do anything making that determination, and that would have to be remanded. I disagree with that. Tell me why. This court, I think, is, based on the record that we've presented to you, is in the position to make that determination as to blend costs. And in large part, that's based on what the district court had already found on summary judgment, which he found. It was a controverted and disputed fact that was proven that the blend costs complied with the public participation requirement of the NCP based on DTXC's and DDW's involvement in the remedy, I guess, for the cost of the incurring of the cost of blend water. Okay. So your position is that the jury awarded damages for future costs for 30 years, but that only covers the costs to install and operate treatment facilities. It doesn't cover blended water. There is a separate. So in the – and I think the district court did a great job on this, but he kind of broke it down. The jury, the expert, Dr. Nesham's testimony and cost estimate for the treatment facilities and to operate them and maintain them for 30 years came out to, I think, around $65 million. And the jury award went for $68. something million. And there was about $3.7 million in evidence shown in terms of estimates for blend and water costs from the date of trial through a certain period. And I remember, I think it was for blend, it was for, like, October 2023, and replacement might be through February 2025. And so I think there was maybe a hope that this would all be resolved and done and we'd be installing and treatment would be going by those dates, which is why they chose – that there were some arbitrary dates chosen for blend and for future blend and everything like that. And why shouldn't we agree with Whitaker that that $68 million that was awarded covered everything? Treatment costs for 30 years, which would include blend and water. If you asked for 65 and they gave you 68, what's the other three for? So the other three was for the estimate of blend and water costs from the date of trial through when they thought treatment would be up and running. So if it definitely gives you liability and stuff comes up, if there's more stuff that comes up in the future, there would have to be another lawsuit. But then what you're saying is then it would come back before the district court and the district court would say, okay, you're liable. The only thing we're going to decide is damages. Is that correct? And your claim is that Section 9613G2 mandates that the district court rule on entitlement to declaratory relief if there has been a liability finding. That is correct, based on the plain language of that statute. Fairness to the district court. And I don't believe there's any Ninth Circuit precedent, or I don't believe that there's much precedent out there as to what double recovery means. I think that's right. Your Honor, I would know that would be something that we would have to say possibly because it's hard to be, you know, if you put yourself in the position of a trial judge, if you deal with what you have in front of you at the particular time, and if there wasn't anything out there about that, you take a stab and you do your best. But let's say if we said debt relief isn't double recovery, then it's not really violating precedent. I think that's right, Your Honor. And fairness to the district court. You know, I think for all intents and purposes, it was actually very deliberate in the case across the board from the jury verdict and rejecting the new motion, new trial motions and the like, all the way to this. We think you've got something wrong. But, you know, that happens, I guess, sometimes because we've not taken it over right now. Well, I was just going to ask, why wouldn't the result in this case be race judicata on the question of liability in any future linkage for one cause? I don't think I understand your – Well, you want a declaratory judgment that says Whittaker is liable so that if we have to go back into court, we're going to begin with damages. Correct. And I'm asking you, why do you need a declaratory judgment? Why can't the agency simply raise the document of race judicata in this future litigation to show that Whittaker has already been found liable for one cause? Yeah. I mean, in essence, you want an insurance policy from the district court that says we don't have to litigate liability all over again. That's one way to put it. I'm also just asking for what the statute says is mandatory. I'm not – you know, between us, I'm not sure I would have come up with that idea if the statute didn't say that really was mandatory. Would it be okay if I addressed RICRA for two seconds? I'm going to give you ten minutes. Okay. So when you come back, I'll give you a chance to talk about RICRA. Thank you. I'm sorry, ten minutes. Is that okay? Yeah, yeah. It's a little bit unorthodox that we're really trying to get – I'll let you talk about RICRA a couple of minutes at least. How's that? Your Honors, I would actually like to thank you very much for granting Whittaker an additional ten minutes, but I would like to save a couple of minutes to respond on RICRA as well. It's easy. Well, how do you go about this? It's unorthodoxy, unorthodoxly as we have in getting everything we need. Could I address – because I'm assuming you're going to want me to respond on the circular issue, and unfortunately you do have an environmental lawyer up here today, so I probably have too much to say on 9614 and declaratory relief. But what I would like to do is return to a couple of points that Dr. Thompson made. I think it was I counted three times, it might have been four times on this issue as a reasonable list of damages. The statement was made that Whittaker has said over and over again, we certainly did get a freebie here. It's not a big deal that the water is BC and TTCs below MCLs. Whittaker only said that because that is what Santa Clarita Valley has said to its customers for decades. Santa Clarita has represented that it's no big deal. The water is safe to drink. At S1 and S2, we're providing that water with some blending. It's not a big deal. Let me turn to that blending issue. It is uncontroverted that water from S1 and S2 is blended. The problem that were presented during that. But, Your Honors, again, I know I'm a broken record. What we believe, we are brave, is accurately stating that they don't get an award to return water to anything other than its original condition. It can't be better. But there's a further step here. That's because there is to be no windfall. Let me just raise one issue you should ponder from a slippery slope standpoint. We know it's undisputed that water is blended at S1 and S2, and it's served. Permit from 2012 granted by the Division of Drinking Water allows that. Is that cheaper than the GAC treatment that they're proposing at that level? No evidence on that. What if, down the road, Division of Drinking Water under 97-005, the policy, not the law that Ms. Meeker alluded to, if the Division of Drinking Water says, you know what, just blend it. It is cheaper. Why? I guess I'm just fundamentally how trials work. I'm wondering, sometimes I'm hearing you say they have to do the work sometimes. Why? You know, you don't want a jury to give damages if you think they're over-asking. You put stuff in, too. So why didn't you do that? We could designate no expert on diminution of value. We could designate no expert to testify on blending as an alternative remedy to GAC. We had no opportunity to do so because the theory of restoration costs, which raises the issue of returning water to its original condition as a requirement of the law and also showing that the restoration costs are not unreasonable in comparison to the damage, was not raised until after expectation. I'm just curious if you had witnesses from the agency itself, and I assume the people who oversee the operation of the system, that admitted to the jury that there were contaminants in the water that were below the regulatory levels when the water was treated. Before it was treated. Before it was treated. So I'm still struggling to figure out what additional evidence you were deprived of through the late disclosure of the legal theory. The use of granular activated carbon system, which is the sole measure of damages, we return the water to the original condition, as opposed to merely returning it to the condition before it would occur contamination or whether it would, in fact, return it to condition better than existed prior to Whittaker. I'm sure this is in the record, and I apologize. So I understand your argument that you didn't do these designations because, in your view, you weren't on notice that plaintiffs were claiming this issue. I understand your argument. But did you ever go to the district court and say, here are the people we want to designate on these issues, here are the experts, here's the diminution in value experts, here's the evidence we want to offer in the district court? Either said no, irrelevant, or no, too late. Essentially, your Honor, we raised the issue that this was an inappropriate change. I understand that. That was not my question. My question was, at any time, did you, whether timely or late, say, here's what we want to do in response to this, here are the experts, here are the witnesses, we know time has passed, but here are the reasons we think we should be able to do it. And the district court said either no, irrelevant, no, too late, or no, for some other reason. There was no Rule 15 or 16 motion to continue the trial date to seek supplemental amendment on these issues. And you didn't say, you know what, Dr. So-and-so, he is an expert who can testify on the condition of the land, there is no diminution, they haven't proved it. And the judge said, no, too late or irrelevant, that never happened. Yeah, no, instead, your Honor, the judge ruled that we weren't prejudiced by the late change in theory because we knew the cost of cleanup, and that was all we were entitled to know, as opposed to the theory of cleanup. And so his Honor said there will be no change, we're moving forward. But you had the admissions, and you argued to the jury that the agency was seeking excessive costs for treating whatever had contributed to the water. So what's missing? I would say there are better witnesses than some expert that you got and hired yourself. If you can get people in the agency to say, hey, I mean, I'd go back to the bank and say, yes. And I think your Honors have that evidence in front of you. I think it's undisputed that the water is really not very contaminated, and there's a question as to whether it's reasonable to award almost $60 million in VOC treatment for water that for, you know, in some wells, over 20 years, has never met or exceeded an MTL when there's testimony in the record that there's not even an observation. And so the label is related to damages as opposed to that you weren't allowed to. Yes. What I want to realize is that I explained to you. You're giving me another exit. Well, there's a couple of exits, because the court obviously has the ability to review the reasonableness. Ultimately, if the evidence, particularly if undisputed, becomes an issue, you can review that. But also it goes to that's one of the elements that they're supposed to show, is that it is reasonable in relation to PAR. But if I could, because now I realize I just have two minutes left on my 10, I'd like to quickly respond to the declaratory relief issue. So, okay. I agree with your honors. There's not a whole heck of a lot of case law on a double recovery, but certainly it's pretty much straightforward that you don't get that double recovery. Plaintiffs in their cases. I have a declaration double recovery. It's not getting it at the state at 68 times 2. It's just, you know, I'm seeing, you know, being the strategist myself, I'm seeing that, okay, that means you can't come back. We're not going to start over again when this comes back. And both of you are probably the gift that keeps on giving. So, yes, declaratory relief. And, you know, these things have a life, you know, a life long beyond ours sometimes. The dilemma is really one, I would say, and I'm not being pejorative or critical. It's a problem of the making of Senator Clear to Valley and how they basically are seeking their declaration. In their case, they thought the construction and operation of the granular activated carbon cleanup system as an element of the future damage they're going to recover. CERCLA doesn't provide for future recovery, future damages. You only get to recover damages you've already incurred. They also ask for a certain measure of blend and replacement water costs. And that was awarded to them. They didn't ask for more. They asked for a specific amount. And the judge said, okay, wait a second, I can't award you blend and replacement water costs because those have already been awarded to you based on what you have. I'm looking at 42 U.S.C. 9613 G2. In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. Now, while there are statutory construction cases that say may, can, mean, shall, there aren't very many that say shall, can, mean, may. Yeah, this is where I say this is a product of standard clear zone making, which you look particularly in their briefing when they quote 9613 G2. You just read the language of the statute. They actually, in their declaratory, really in what they argued in this case, they say the district court was required to, quote, enter declaratory judgment on bracket, whatever is liability for bracket, these response costs. They added these. They added the blend and replacement costs. Under the city of Colton case, what we would refer to as Colton 1, city of Colton emphasized that the language of 9613 points out that you're entitled to declaratory relief for further response costs, which points back to the response costs that you proved you could recover in your cost recovery action in the first instance. So if we were to disagree with you theoretically as to what the statute provides, but we were to make clear, for example, hypothetically, that this should not be interpreted as a license for any kind of double recovery at all, would there be anything where that wouldn't protect you sufficiently? Well, I'd like to address what the court did. I would say, Your Honors, that plaintiffs proved at the time of case that they incurred response costs in the form of ISEP investigation costs. And should they incur future further investigation costs in the future, that a declaratory relief would be appropriate, finding a liability, so that they proved at least $1 of investigation costs as a response cost that was consistent of NTP, et cetera. And then if they incur more response costs in the future and subsequent action, those response costs being investigation, that they can go to trial and say, all we have to do is show that these new form of investigation costs meet the NTP, they're necessary, et cetera. Well, liability is not going to be, because I thought Ms. Meeker said there weren't going to be any future. Exactly. That's correct. But the court concluded that they did not prove that they incurred response costs in the form of BLEND and replacement water costs. As for replacement water costs, they concluded that the evidence did not show that the replacement water costs were consistent with the NTP. So the court said, under CERCLA, you didn't prove replacement water costs. Therefore, when you look at the language of 9613G2, it says you may get a declaration, public binding, for further response costs or damages. So if we were, for example, hypothetically, again, to agree that the district court got the NTP public participation issue correct, that would take care of their entitlement to discount the declaratory relief on the replacement water. Yes, sir. I'm maybe misremembering your brief, but I seem to have a recollection that you said in your brief, but as to BLEND, if you got to that point and you shouldn't, but if you got to that point, you'd have to send it back. Yeah, because what happened, Your Honor, is the court didn't actually render a ruling on NTP consistency for the BLEND water cost, so I'm not misremembering your brief. Yeah, and this has changed a little bit. You know, my argument, as we've gone along, this purpose of looking at that bracket, BEATS, that was not, if I stand, accelerated to its briefing, is important. Because in many respects, it really aligns to your quote and why and how the courts look at what you're entitled to declaratory relief to recover further response costs, those further response costs being the same type that you already proved. Liability, because costs are an element of liability under 9607 and CERCLA. You have to prove that to be able to prevail on it. Was there a proposed form of declaratory judgment that was lodged with the district court? Not that I'm aware of. Ms. Meeker can probably address that, but no. No, it was really just, and this enhanced around a little bit in the briefing, but I think looking at it from the Colton BLEND standpoint, I've gone way over my time. If they addressed it where I would have addressed it. Okay, thank you. Okay, I think we're done on this. I'll decide that Solomon looks like we're out of time. We need to go now. Judge Solomon. Okay, thank you. Judge Solomon. Yes. All right, so we're back. We're back. We are back. And I'm going to, I think the rules are not allowed to talk about, there aren't really rules here. Okay. We're just trying to get rid of whatever. I'm not holding you strictly to the proposal. You know, you can't. Okay. You know what, let me, if you don't mind, let me jump right into the surplus, if we can just, since we're there still. Okay. I'll make it really quick. If I, in my drafting, said these costs, and it wasn't clear that I was talking about further cost, it's the same type of these, you know, replacement, blend, and IPD. Please punish me, don't punish my clients for that. I can assure you we are not seeking double recovery of anything that we have already been awarded. What we are seeking is in the event that there are further costs in those categories of costs, blend, water, replacement water, and IPD, that we believe that under the statute we are entitled to declaratory relief or judgment on liability, not on recoverability, not on the amount, but on liability to those costs. So you're now saying there might be future IPD costs. Well, I think it's too, to judge from it, that you can ask, you know, and I apologize for jumping the gun on that. I have said that right now I can't, I don't know of any future costs in IPD, but I can't foreclose the potential that, you know, there's something else happens with the development of these treatments and, you know, a further permit or a further design or a further, I just, as I don't know, as I sit here I do not know, so I do apologize for being so delirious. The jury's 30-year future award. It's on the maintenance and the construction of these facilities. This is different from treatment of the water. Well, I think there's. You're talking about building treatment facilities at each wellhead. So there's a building of a treatment facility at each wellhead, that's correct with the four, and then instead of construct. Yeah. And then there would be the issue of running these things. You say running the treatment facility does more than just treat, right? It also blends, if appropriate. I don't think it does. What we're talking about is a GAC treatment facility, which is talked about. All it does is remove. It removes the BSDs. Okay. And then I think there's a perforate facility for B205, because it has no treatment whatsoever. So that facility, and I admittedly, I don't know if they're two separate or if they're kind of combined, but that particular well would have a facility that does both perforate removal or treatment, as well as the GAC treatment for BSDs. Okay. Moving on for a second. At the end of the original condition discussion by counsel, you know, he brought up the issue of a windfall. And, you know, I think it's important to note that, you know, if we were to have a windfall on the ground, then we would be getting a windfall because the water is really not that contaminated. You know, and, again, I want to bring us back to the fact that the standard of review here is substantial evidence when you're talking about the reasonableness of a jury award. And this does sell into my record of argument, so I'm getting there, I promise. But the jury heard evidence. The jury heard substantial evidence of the indiscriminate dumping of carcinogenic and hazardous materials into the ground at the Winifred site, and that it was stipulated that these contaminants were at the site. It also was stipulated that both the POCs and perforate release at the site are in the wells. The jury has heard evidence that the POCs from Whitaker site are in the wells. And this is where, and from that point, the jury verdict is reasonable in awarding shake-up costs. But then moving to RCRA, which requires a showing, and this is according to 4010, we are looking for a great shake-up of the RCRA, and I'm going to tell you why. I'm just going to so that you have an opportunity to respond, and that gets others fired a little bit. The judge heard evidence on this, and so, in my mind, almost in weight evidence on this. And just said there's nothing imminent or, you know, that doesn't meet that level. And unless you can basically show me, to me, it's almost like a sufficiency of the evidence. If you can show me there's no evidence that supports where the judge got, then you got me. But if it's a weighing situation and the judge just said, you know, because apparently, you know, the one thing moves fast and moves at the speed of water, and the other, with the POC, is like the tortoise, and moves slowly and clumps and does all of that. And so I'm just, you know, and maybe the next time you come to court, you can say that the POC has moved another two inches. But I just took it that the judge weighed it all and just said, hey, you didn't meet the standard. So thank you for redirecting me. My argument to you is that the judge didn't actually apply the correct standard. What the judge said was, in his ruling, his plaintiff has not shown the situation has taken a turn for the worse and concluded that the risk of future harm is speculative. And the problem here, and this is at ER 1162, paragraph 105. And what the problem here is that there's no, under the imminent and substantial endangerment portion, there's no requirement that we prove that the situation has taken a worse. And, in fact, by nature, this risk of future harm is kind of inherently a little bit speculative. I mean, the language that you quoted from the judge, in a practical way, isn't the judge really referencing imminence? I think, yes.  So,  the court has interpreted the imminent and substantial endangerment as a risk-based standard. And this is, in particular, it's really well laid out nicely in Burlington, Northern and Santa Fe, which is 505 S30, 1013 and 1020. It's a 10th Circuit case. The court has interpreted the imminent, well, actually, the U.S. Supreme Court merits, imminent means that there must be a threat, which is present now, although the impact of the threat may be felt later. And the Burlington case says that the language in 60, the 40GUSD section 6972 uses the word may present an imminent and substantial endangerment to health or the environment. And Burlington interprets that as being a flexible. And it authorizes court to grant equitable relief to the extent necessary to eliminate any risk posed by the toxic rate. And in this case, when you look in, when you apply that standard, and you look at the evidence of the fact that there's still contamination at Whitaker site, in groundwater at Whitaker site, and that there's, and we cite this in a chart in our brief on page 16, that the contaminated groundwater that's under or near Whitaker site is a And then you have Whitaker's own expert, Gary Hokeaman, who testified that the groundwater was that level of contamination, 100 times to 1,000 times. It doesn't stop migrating at the site's property line. Rather, it continues to migrate beyond the property line in the northwest early direction towards Santa Cruz as well. And that's that supplemental extrovert record 1064 and 1065. So when you take the fact that, you know, it's not that everything's clean, looks good, life is good, you still have massive amounts of contamination in the groundwater at Whitaker site that's still migrating. And the court heard that, but the court just didn't. You said the sky is falling, and the court said, no, it's not. Essentially. And again, we think that because the court came to the conclusion that the And the 200 monitoring wells matter all in this. So the 200 monitoring wells are on or near Whitaker's site. So it doesn't account for the contamination that has already traveled off site, and that's what we're asking for with RCRA, is an injunction requiring the off-site contamination that we know is characterized to be investigated and to be delineated so that we know where that contamination is, where it's going and the like. And that's the problem that the 200 wells don't serve a purpose on because it's limited to what's already on the Whitaker site or only on the Whitaker site. So don't you want them to have another monitoring going on or something that's not that part of what you argue? What we'd like for RCRA, you know, is this on-site monitoring, which DTMC is overseeing, but it's the off-site monitoring that there is none. And that's what we would like RCRA to fill in so that, because there is a risk that this existence of contamination that's continuing to migrate in high levels of contamination, once it gets off the site, it's, you know, not a problem. We're talking about Whitaker 2. We're talking about Whitaker 2, the next round of litigation. And hopefully it will come along after I'm no longer hearing David. I don't want to speculate here. So I think with that, I will sit down unless your audience has any other questions. Okay. We'll see if we have any questions after. Okay. So I said you can get up and talk about with Rick Russ. So how long do we give him to talk about Rick Russ? I defer to Solomon. I don't know where the 419 came at. Oh, that's over. So how about three minutes to talk about Rick Russ and if we're still pondering Rick Russ. I'm not in a position, Your Honor, to dispute the wisdom of Solomon. Let me just quickly make a record on what Your Honors are alluding to, which is the standard of review on the district court's decision on the imminent substantial endangerment issue under Rick Russ. A case that both parties cited in their pleadings, which may have been a little bit varied, is Interfaith versus Honeywell. And that's actually a useful case because, in that instance, the Third Circuit actually sat down to really look across all of the circuits and say what is the standard of review on the district court's determination of imminent substantial endangerment. In that case, they pointed out that the 5th, 6th, 8th, 9th, 10th, 9th, most importantly, in addition to the 3rd, have applied because imminent substantial endangerment is considered a mixed issue of fact and law. But what the court pointed out in all the circuits, including the Ninth Circuit, have stated is that where you have a mixed question of fact and law, where the question is a fact, which is what even the Supreme Court has concluded predominates in a imminent substantial endangerment issue, the clearly erroneous standard applies. So you're right in saying that. We are to defer to the district court in making this decision because both the Ninth Circuit and the Supreme Court have previously held that. These are tough factual questions, often called for experts, have a lot of tricky stuff. It is appropriate to defer to the trial court. Judge Blumenthal. And I assume he's relying on the 11 days of trial testimony. He did, Your Honor. And Judge Blumenthal really pointed out in going to Senate Florida's arguments regarding basically what they're saying is imminent substantial endangerment arises out of the Whitaker site, which is what they talked about, these high levels. It's what the contamination migrates away out into the aquifer. The undisputed evidence, and what the judge pointed out, is Whitaker and the Department of Defense have done a heck of a lot of cleanup out there. They have a containment system. And the DTSC actually responded to a request from Senate Florida to install more investigation tunnels out in the aquifer. DTSC said, we've got it covered. We in the Division of Drinking Water or Monitoring the Water Quality Standards are on top of whether there is any threat from the Whitaker site to you and health of the environment out in the aquifer. We can address that ourselves. And as a matter of fact, no, you can't have it. And so the court considered that, considered the many years of a cleanup that's been going on in the containment system that I would argue is quite effective in capturing the high levels of contaminants that I'm pointing to, given that in 20 years we don't have contaminants even approaching MTLs in their drinking water wells. They just have them designated as a superfund. No, it has not, sir. And the multiple representations by cleaners themselves, the aquifer state, the water state. So the court evaluated all of those issues based on the facts and concluded that there was no imminent substantial endangerment. There was a statement that this question of law, plaintiffs argue that there is groundwater contamination is there under the APEX case, that it's a de facto imminent substantial endangerment. The APEX case, which is another circuit, actually doesn't say that. It basically says that the idea that groundwater contamination significantly in excess of government standards may be evidence of imminent substantial endangerment. Hey, you're over. You're over. Okay. Now, let me just find out if any of my colleagues have any other questions they want to ask. Okay, so I want to thank both of you. Thank you. I think I haven't conferred with the panel, but I think I can safely speak that we appreciate both of your arguments, and you were both very well prepared. Yes. And it was very helpful. And even though we have a little levity, please don't take that as that we don't take it seriously. We just all try to make each other a little more comfortable when we have to discuss all these difficult things. And I can assure you that we've already spent a lot of time on this case and probably can expect that we will spend quite a bit more. So thank you both. And you've acquitted your positions well, and this matter will stand submitted. And we, of course, now wait. All right.
judges: TALLMAN, CALLAHAN, BENNETT